

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

PTH:JRS
F. #2019R00447

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 30, 2020

By ECF

The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. John Martin
      Docket Nos. 03-CR-795 (RJD) and 19-CR-221 (S-1) (RJD)

Dear Judge Dearie:

   The government respectfully submits this letter in response to the defendant's motion for bail, dated March 26, 2020 (ECF Dkt. No. 36 ("Def. 2d Mot.")).

   The defendant has been on federal supervised release since 2015 following his 2006 conviction for participating in a violent narcotics conspiracy. See Case No. 03-CR-795, ECF Dkt. No. 636 (the "Report" or "VOSR"). On May 29, 2019, the defendant was arrested for organizing an armed home-invasion robbery during which both of the defendant's co-conspirators sexually assaulted one of the victims and threatened to murder the three children and five adults inside the home. See Case No. 19-CR-221, ECF Dkt. No. 1 (May 24, 2019). For these crimes, the defendant was charged in a superseding indictment, filed on July 19, 2019, with Hobbs Act conspiracy, attempted Hobbs Act robbery and brandishing a firearm in furtherance of a crime of violence. See Id., ECF Dkt. No. 16.

   On June 23, 2019 (prior to the filing of the superseding indictment), the defendant filed his initial motion for bond. See Id., ECF Dkt. No. 10 ("Def. 1st Mot."). The Honorable Lois Bloom denied the motion, finding that the defendant had failed to meet his burden of "establishing by clear and convincing evidence that [he] will not flee or pose a danger to any other person or to the community." Fed. R. Crim. P. 32.1(a)(6); see also Case No. 19-CR-221, ECF Dkt. No. 14.

   The defendant offers no new facts to alter Judge Bloom's earlier determination that he cannot meet this burden. Accordingly, detention remains mandatory. The defendant's motion should be denied.

I.      Background[1]

      A.      The Home-Invasion Robbery

      The defendant was one of three robbers in an armed home-invasion robbery on May 4, 2019.  Much of the robbery was caught on surveillance video from cameras located inside and outside the home.  The occupants of the home were five adults (including an elderly, disabled woman) and three young children.

      The day of the robbery, the defendant called and texted with his two co-conspirators approximately four dozen times.  In particular, at approximately 2:00 p.m. that day, one of the co-conspirators — co-defendant Corey Mobley ("Mobley") — texted the defendant to ask, "What's up for tonight?"  The defendant responded, "Let's see how things plan [sic] out."

      That night, at approximately 9:30 p.m., the defendant's two co-conspirators forced their way into the victims' home while brandishing a firearm.  According to cell site data obtained by warrant for the defendant's cell phones, the defendant was at that time either right near the home or on his way there.

      Once inside the home, the two co-conspirators forced the screaming occupants into a downstairs bedroom.  Because the elderly woman could not walk, Mobley dragged her and the young child she was holding across the floor into the room.  These two robbers immediately asked where the camera system in the home was located.  They then told the victims that they knew there was money in the house and they were not leaving without the money.  Mobley further threatened to kill all of the occupants if they did not tell the robbers where the money was.

      These two robbers pulled one of the occupants ("Victim-1") out of the bedroom, brought her upstairs and again demanded to know where the money was.  Victim-1 said that she did not know because the house belonged to her brother, who was not home.  The robbers then searched and ransacked the upstairs bedrooms, including by searching inside the air conditioning vents in the ceiling.  While upstairs, one of the robbers ("Robber-1") pulled down his pants and Victim-1's pants and rubbed his penis against her vagina.

      At approximately 9:40 p.m., Mobley called the defendant, told him that he and Robber-1 were inside and asked the defendant to come inside.  The defendant entered the home for several minutes, spoke to the other robbers and then went back outside to a four-door sedan.  According to cell site data, the defendant remained in the area for the next

---

[1]  Much of the facts and arguments below were set forth in the government's opposition to the defendant's first motion for bail.  See ECF Dkt. No. 11 (June 25, 2019). The government repeats these facts and arguments here for the convenience of the Court.

fifteen minutes and continued calling his co-conspirators inside the home, with one call to Robber-1 and over a dozen calls to Mobley.

After the defendant went back outside, Mobley pulled Victim-1 into her mother's bedroom, where he inserted his fingers into Victim-1's vagina and attempted to insert his penis into Victim-1's vagina, but he was not able to maintain an erection. Mobley then forced Victim-1 to perform oral sex on him until he ejaculated. Robber-1 and Mobley fled the scene in an SUV at approximately 10:10 p.m., the same time that the defendant's cell site records show that he left the area in his separate car.

Robber-1 and Mobley were quickly identified by state authorities through DNA left at the home. Robber-1's DNA was found to match DNA on scraps of latex gloves left in the home, and Mobley's DNA was found to match semen found inside Victim-1's mouth and on her jacket. Robber-1 turned himself in to state authorities within a week of the robbery, and Mobley was arrested by federal authorities that same week for a Hobbs Act robbery of a drug dealer in Brooklyn, New York.

The defendant was identified by federal law enforcement agents using phone records obtained during the federal investigation into Mobley. In addition, federal law enforcement obtained recorded calls from inmates inside New York state prisons to the defendant that conclusively tied the defendant to the robbery.

Specifically, shortly before 9:40 p.m. on the night of the robbery, the defendant received a call from an inmate in a New York state prison, which was recorded. On the call, the defendant stated that he was "working" and that he "got a new job." The inmate on the call was apparently surprised to hear that the defendant was working, and asked what work he was doing. The defendant responded that the caller knew what work he does: "extermination." The inmate laughed in response.[2]

Near the end of this recorded call, the call is interrupted by a ringing cellphone. The defendant stated, "I think these niggas in there," and told the inmate to "hold on." On the recorded prison call, it is possible to hear the defendant answer a second cellphone and to hear his conversation on the other cellphone. On that conversation, the caller to defendant's other cellphone states that he is inside and that the defendant should come inside. The defendant then hung up his call with the inmate.

---

[2]  In his original bail motion, the defendant claimed that this reference to extermination was innocent because "[i]n fact, Martin was working as an exterminator." Def. 1st Mot. 7 n.5. That is false. The defendant was certainly not working performing legitimate extermination work at 9:40 p.m. on a Saturday night — rather, as the call records, video surveillance and cell site records show, he was at that time participating in the robbery. Moreover, as the defendant himself told both Pre-Trial Services and Probation, he had not worked as an exterminator since 2018. VOSR 9.

This overhead phone call was the same call captured on the video surveillance of the robbery during which Mobley called the defendant to tell him to come inside. Moments after that call, the defendant was captured on surveillance video entering the home.

### B.   The Defendant's Criminal History

The May 4 robbery was the most recent in the defendant's long string of violent crimes, including prior robberies, an attempted murder, multiple shootings and a kidnapping.

The defendant's first arrest was for an armed robbery in 1988, when he was 16 years old.  He was arrested for a second robbery two months later and ultimately pleaded guilty to them both and sentenced to terms of one to three years' imprisonment for each offense.  While in prison for those offenses, the defendant was arrested twice for assaulting prison employees.  He resolved those arrests by pleading guilty to making and introducing dangerous contraband into the prison.  He was released on parole in November 1995.

According to the defendant's 2006 Pre-Sentence Investigation Report (the "PSR"), the defendant returned to criminal activity that same year, within two months of his release from prison.  That year, the defendant joined the "Martin Family Crew" — a violent drug trafficking organization led by the defendant and his siblings.  PSR ¶¶ 6, 14.  The defendant's role in the organization was to act as the "enforcer" and to manage the organization's drug distribution operations in Connecticut.  PSR ¶¶ 7, 14.  In 1996, while still on parole, the defendant shot a rival drug dealer in the stomach in the middle of a video store.  PSR ¶ 27.  He was arrested and convicted for this shooting and served approximately five years in prison.  Shortly after his release, in 2001, the defendant shot at two additional members of a rival drug dealing crew, but all witnesses to the crimes (including the victims) were too afraid of the defendant and his family to speak to the police or to press charges.  PSR ¶¶ 30-31.  In 2003, the defendant, his brother Jerrod and another member of the Martin Family Crew kidnapped one of the organization's couriers at gunpoint when she failed to make a delivery.  PSR ¶¶ 33-37.  The defendant and his brother repeatedly slapped the victim and took her to the defendant's apartment, where she was beaten by his brother and forced to insert drugs into her vagina for a subsequent delivery.

The defendant was indicted on federal charges for his role in the Martin Family Crew in 2003.  From the fall of 2004 until his arrest in May 2005, the defendant was a fugitive.  PSR ¶ 41.  On July 5, 2006, the defendant pleaded guilty to one count of distributing cocaine and cocaine base and was originally sentenced to 235 months' imprisonment and twelve years of supervised release.  Case No. 03-CR-795, ECF Dkt. Nos. 266, 284.  Following amendments to the United States Sentencing Guidelines, the defendant's sentence was reduced to 188 months in 2008, 168 months in 2012 and then 140 months in 2015.  He was released from prison in November 2015 and commenced his term of supervised release.

II.     <u>Legal Standard</u>

In the pre-trial context, the government bears the burden of showing that the defendant should be detained, either by showing a preponderance of the evidence that the defendant is a flight risk or clear and convincing evidence that the defendant is a danger to the community.  <u>United States v. Mercedes</u>, 254 F.3d 433, 436 (2d Cir. 2001).  In cases such as this, however, where there is probable cause to believe the defendant has violated 18 U.S.C. § 924(c), there is a statutory presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(A), (B).  Even if a defendant can overcome that presumption, the special risk of dangerousness posed by defendants who have committed such crimes "remains a factor to be considered among those weighed by the district court." <u>Mercedes</u>, 254 F.3d at 436.

Here, the burden on the defendant is even higher.  In the supervised release context, the court "shall order" a person charged with violating the terms of his supervised release detained unless the court "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released."  18 U.S.C. § 3143(a)(1); <u>see</u> <u>United States v. Porter</u>, No. 03-CR-0129 (CPS), 2007 WL 3232502, at *5 (E.D.N.Y. Nov. 1, 2007) (applying § 3143(a)(1) to detention pending a hearing for revocation of supervised release); <u>see also</u> Fed. R. Crim. P. 32.1(a)(6).  Further, the defendant — not the government — bears the burden of proof and must "establish[] by clear and convincing evidence that the person will not flee or pose a danger to any other person or to the community."  Fed. R. Crim. P. 32.1(a)(6).

In determining whether a defendant poses a risk of flight or a danger to the community, courts are required to consider four factors:  (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence" or whether it "involves a . . . firearm"; (2) the "weight of the evidence against" the defendant; (3) the "history and characteristics" of the defendant, including his "criminal history" and whether he committed the charged crime while under court supervision; and (4) "the nature and seriousness of the danger . . . posed by the defendant's release."  18 U.S.C. § 3142(g).

III.    <u>Argument</u>

The defendant cannot meet his burden of showing by clear and convincing evidence that he "will not flee or pose a danger to any other person or to the community."  Fed. R. Crim. P. 32.1(a)(6).  Indeed, Judge Bloom previously found exactly that, and the defendant offers no new facts to mitigate his dangerousness or risk of flight.

The defendant's dangerousness is shown by his most recent offenses and his long, unending pattern of committing serious and violent crimes whenever he is outside of prison — and, indeed, even when he is inside prison.  In addition, the fact that the defendant committed the instant, violent robbery while on supervised release undermines any claim that the proposed bail package could ensure his compliance with any conditions of release.  Moreover, the overwhelming evidence of the defendant's guilt and the likelihood that he will

5

serve a substantial sentence gives him every incentive to flee. Thus, as set forth below, each factor under section 3142(g) favors detention, and the defendant's proposed bail package is inadequate to protect the community and to ensure the defendant's appearance.

### A.    The Nature and Circumstances of the Offense

The VOSR charges the defendant with committing two federal, state or local crimes, namely, robbery and brandishing a firearm in furtherance of a crime of violence, and with possessing a firearm in violation of the terms of his supervision. VOSR 5-6. The superseding indictment further charges the defendant with Hobbs Act robbery conspiracy, attempted Hobbs Act robbery and brandishing a firearm in furtherance of a crime of violence.

As set forth above in detail, these offenses stem from conduct that was violent and dangerous. Moreover, the evidence demonstrates that the defendant was the organizer of the robbery. Mobley checked in with him that afternoon to see if the robbery was going forward. The defendant's co-conspirators called him once the victims were subdued to let him know to come inside. Once inside, he conferred with his co-conspirators briefly before returning to his car to communicate with them remotely. He did not drive the other robbers to or from the robbery, and he provided no assistance other than his apparent managerial role.

The defendant makes no effort to dispute these facts. Rather, as he did in his first motion, the defendant attempts to raise legal challenges to the charges, arguing here that the government will be unable to prove an effect on interstate commerce and that attempted Hobbs Act robbery is not a crime of violence for purposes of § 924(c). Def. 2d Mot. 5-13. These arguments are utterly beside the point.

The defendant will have the opportunity to raise these legal claims in his pre-trial motions, which are due on April 19, 2020. See Case No. 19-CR-221, ECF Dkt. No. 34 & Id., Order, dated Mar. 6, 2020. The government will demonstrate that these claims are meritless in its motion response, which is due on April 30, 2020. See id. But even assuming arguendo that the defendant were correct on these legal challenges, the defendant cannot dispute that his conduct would constitute a state law robbery and thus violate the terms of his supervised release. Further, whether the defendant's conduct violated federal law or state law or both, it is equally dangerous. See Mercedes, 254 F.3d at 437 ("[T]he nature of the crime with which [the defendant] has been charged — conspiracy to commit armed robbery of a drug-dealer — weighs heavily against release.").

### B.    The Weight of the Evidence

Aside from the defendant's legal challenges, the defendant does not dispute the strong evidence of his involvement in the robbery. As noted above, the defendant is tied to the robbery through dozens of call and texts between him and his co-conspirators, cell site data placing him at the scene of the robbery and video surveillance showing him inside the

home during the robbery.  That strong evidence confirms the defendant's dangerousness and gives him a strong incentive to attempt to flee rather than stand trial.

           C.       <u>The History and Characteristics of the Defendant</u>

        The defendant's history demonstrates his risk of flight, his inability to comply with conditions of release and his persistent danger to the community.  In addition to his numerous violent crimes — including two prior robberies, three shootings and a kidnapping — the defendant has previously been a fugitive and has repeatedly violated the terms of his supervised release.  Indeed, less than two months before the May 4 robbery, the defendant was specifically instructed by then-Chief Judge Irizarry (who was then overseeing his supervised release) not to communicate with felons.  Yet, the defendant continued to speak to incarcerated felons on the phone, including on the night of the robbery.  Further, the evidence in this case shows that he not only communicated with felons (both Robber-1 and Mobley have prior felony convictions), but also actively conspired with them to commit a robbery — all while on supervised release.

        Accordingly, the defendant's history also weighs heavily in favor of detention. <u>See</u> <u>Mercedes</u>, 254 F.3d at 437 (district court "committed clear error" in failing to find defendant dangerous where "[i]n addition to the [armed robbery] charged . . . [the defendant had] twice been convicted of weapon possession — one felony conviction, and one misdemeanor conviction").

           D.       <u>The Defendant's Proposed Bail Package Is Inadequate</u>

        Given the factors discussed above, there are no conditions of release that could assure that the defendant would not flee or pose a continuing danger, regardless of who bears the burden.  But even if such conditions were possible, the defendant's proposed bail package does not rise to that level.

        First, while the defendant offers to be subject to GPS or electronic monitoring (Def. 2d Mot. 2), the Second Circuit has repeatedly held that such conditions are inadequate to overcome a presumption of dangerousness, let alone to satisfy a supervisee's burden of proving his lack of dangerousness by clear and convincing evidence.  <u>See</u> <u>United States v. Orena</u>, 986 F.2d 628, 632 (2d Cir. 1993) (because "electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology" and "monitoring equipment can be rendered inoperative," district court clearly erred in holding that such conditions alleviate dangerousness); <u>accord</u> <u>United States v. Dono</u>, 275 F. App'x 35, 37 (2d Cir. 2008).  As in those cases, without detention of the defendant, "protection of the community would be left largely to the word of [the defendant and his sureties] that he will obey the conditions."  <u>Orena</u>, 986 F.2d at 633.  Moreover, the defendant was able to carry out his managerial role of the charged robbery in large part by phone.  GPS or electronic monitoring could not ensure that he would not continue to plan and orchestrate robberies.

Second, the defendant's proposed sureties are insufficient to ensure that the defendant complies with the conditions of pretrial supervision:

- Joyce Funn Martin is the defendant's wife, from whom the defendant told Pre-Trial Services he was separated. Ms. Martin was married to the defendant while he was an active member of the Martin Family Crew and while he was a fugitive. Because of her past inability to assure the defendant's compliance with the law, there can be no confidence that she will be able to assure his compliance now.

- Rashawn Johnson is the defendant's sister-in-law. According to NYPD records, she has been arrested at least six times, including for robbery, assault with intent to cause physical injury and resisting arrest. Given that criminal record, there can be no confidence that she will provide the necessary moral suasion or properly assure the defendant's compliance with the terms of his release.

- Seidah Abu-Bakir is a friend of the defendant. Because Ms. Abu-Bakir lives in Thornton, Pennsylvania, over a two hour drive outside New York City, she cannot realistically monitor the defendant's behavior or assure his compliance with the terms of his release.

- Quaseim Bonnett is the defendant's nephew. According to NYPD records, he has been arrested nine times, including for robbery, burglary and assault with intent to cause physical injury. As with Ms. Johnson, Mr. Bonnett's arrest record undermines confidence that he can assure the defendant's compliance with the terms of his release.

- Latreace Martin is the defendant's sister. She was arrested for armed robbery in 1991. Based on information provided by the defendant, Ms. Martin could not realistically pay a $500,000 bond and, standing alone, she is inadequate to assure the community's safety and the defendant's appearance.

Thus, the proposed sureties, alone or in combination, are insufficient to ensure the defendant's compliance with the terms of his release, to ensure that he appears in court and to protect the community from the defendant. And even if each proposed surety had a spotless record and could live with the defendant, "none are 'trained' to monitor pretrial detainees and, by no fault of [their] own, cannot be said to be 'trustworthy' in monitoring [the defendant's] compliance with conditions of bail twenty-four hours a day, seven days a week." Dono, 275 F. App'x at 37-38 (finding that veteran police officer was inadequate surety for his son in light of son's dangerousness).

8

Accordingly, for the same reasons that Judge Bloom denied the defendant's original motion for bail, the Court should deny his second motion — which adds no new facts to address the defendant's dangerousness or risk of flight.

### E.   Release Is Not Otherwise Warranted

The defendant claims that release is nevertheless appropriate in light of the spread of COVID-19 throughout New York City and State and the positive test of a single inmate at the facility where he is held, Metropolitan Detention Center ("MDC").  The defendant, who is 48 years old, does not assert that he falls within a high-risk category should he contract COVID-19.  This claim should also be rejected.

#### 1.   Relevant Facts

The BOP has implemented national measures to mitigate the spread of COVID-19 within prisons.  See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

These measures, which have been implemented at the MDC, include the following:

- Suspension of all social and legal visits:  Social visits and legal visits have been suspended for 30 days, with case-by-case accommodations for attorney visits and legal calls.  Inmates will be provided additional inmate telephone minutes each month.

- Inmate movement:  All inmate facility transfers have been suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health treatment.

- Screening and testing of inmates:  All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms.  Inmates with exposure risk factors are quarantined.  In addition, inmates exhibiting flu-like symptoms are isolated (either to single rooms or with other patients) and tested for COVID-19 in accordance with local health authority protocols.

- Modified Operations:  The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

In addition, counsel at the MDC has advised the government that inmates incarcerated at MDC, including the defendant, are permitted to take additional steps to self-seclude, such as by remaining in their cells.  Moreover, the government understands from MDC staff that (i) cleaning supplies are issued once a week, and all inmates have access to soap; (ii) inmate orderlies are cleaning the common areas of the institution; (iii) health services has identified those inmates who fall within an "at risk" population for COVID-19 and are monitoring the needs of those inmates as well as those of the rest of the population;

(iv) showers are available on a daily basis; and (v) legal calls are being provided by unit team staff to maintain communication between inmates and their attorneys.

Although the MDC is not one of the BOP's Federal Medical Centers, the government also understands that, on a case-by-case basis, BOP's health professionals send inmates for consultations and treatments at New York City hospitals and other medical facilities.  The availability of COVID-19 tests is generally limited nationwide, but the BOP is working to test inmates where needed.

With regards to the one inmate at MDC who tested positive for COVID-19, the government understands from the BOP that this inmate was housed on the intake unit for three days before he began to show symptoms, at which point he was promptly tested and isolated.  He was never medically cleared or moved into the general population.

According to BOP records, the defendant has not left the MDC for a court appearance since January 21, 2020, and he was never housed on the same unit and or even the same floor as the inmate who tested positive.  Accordingly, there is no reason to believe that the defendant had any interaction with the infected inmate or with anyone else from the infected inmate's unit.[3]

2.      Legal Analysis

As set forth above, pursuant to 18 U.S.C. § 3143(a)(1) and Fed. R. Crim. P. 32.1, detention of the defendant is mandatory unless he can demonstrate that he is not a danger to the community and is not a flight risk.  See 18 U.S.C. § 3143(a)(1) (the court "shall order" a person found guilty of an offense "detained, unless the judicial officers finds by clear and by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released"); Fed. R. Crim. P. 32.1(a)(6) (violator of supervised release may be released or detained pursuant to standard in § 3143(a)(1)).  Because the defendant has not demonstrated that he is not a risk of danger or flight, he cannot be released, even if he could demonstrate compelling reasons for temporary release pursuant to 18 U.S.C. § 3142(i).

The cases cited by the defendant are not to the contrary.  In United States v. Raihan, No. 20-CR-68 (BMC) (cited at Def. 2d. Mot. 4 n.7), the Honorable James Orenstein denied a motion for the detention of a pre-trial defendant who had tested positive for drugs

_____

[3] The defendant also claims that is his release is warrant because an inmate at a BOP facility has died of COVID-19.  See Case No. 19-CR-221, ECF Dkt. No. 37.  According to the BOP, the inmate who passed away was detained at FCI Oakdale, a BOP facility in Louisiana that is over 1000 miles away from the MDC.  See Press Release, BOP, Inmate Death and FCI Oakdale I (Mar. 28, 2020), https://www.bop.gov/resources/news/pdfs/20200328_press_release_oak_death.pdf.  Moreover, unlike the defendant, that inmate suffered from "long-term, pre-existing medical conditions."  See id.  The inmate's death therefore has no bearing on this case.

while on bail.  See Ex. A at 5-7.  The court held that sending the defendant into the MDC would potentially put the community within the MDC at risk.  Id. at 10-13.  The court emphasized that the defendant was "not doing something to affirmatively endanger people" and that the court was "hesitant to respond to drug usage with incarceration."  Id. at 10, 13.

The facts here are entirely different.  Unlike the defendant in Rahain, the defendant here is subject to the more stringent requirements of § 3143(a)(1) and Fed. R. Crim. P. 32.1, which require his detention if he cannot demonstrate a lack of dangerousness. In addition, unlike the defendant in Raihan, the defendant is charged with a violent crime and poses a significant threat to the community.  And unlike the defendant in Rahain, the defendant was incarcerated long before widespread community transmission of COVID-19 within the United States, and his continued incarceration therefore poses no risk to the community within the MDC.[4]

Similarly unavailing is the defendant's reliance on United States v. Perez, No. 19-CR-297 (PAE), 2020 WL 1329225 (S.D.N.Y. Mar. 19, 2020) (cited at Def. 2d Mot. 4-5). Perez also involved a pre-trial defendant who was not required to prove his lack of dangerousness.  The court in Perez emphasized that its decision was "based on the unique confluence of serious health issues and other risk factors facing this defendant, including but not limited to the defendant's serious progressive lung disease and other significant health issues, which place him at a substantially heightened risk of dangerous complications should [he] contract COVID-19 as compared to most other individuals."  Id. ¶ 1.  The court therefore emphasized that "this Order should not be construed as a determination by this Court that pretrial detention is unsafe or otherwise inappropriate as a general matter or in any other specific case."  Id.  Because the defendant here has not claimed any health issues that put him at heightened risk, and because of the different standard at issue, Perez is inapplicable on both the facts and the law.

The only case cited by the defendant addressing a defendant subject to the heightened standards of § 3143 and Fed. R. Crim. P 32.1 is United States v. Stephens, No. 15-CR-95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020).  See Def. 2d Mot. 4. Stephens involved a defendant accused of possessing a firearm while on supervised release. In that case, the court found that the defendant had "established by clear and convincing evidence that he does not pose a danger to the community," id. at *3, a showing the defendant here cannot make.

Specifically, while the government had previously argued that the defendant in Stephens had possessed a loaded firearm in proximity to drugs, news facts showed that the arresting officer had "identified a different individual as holding the bag that contained the firearm."  Id. at *1.  The court further noted that "Defense counsel presented ample evidence

---

[4]  The day after Judge Orenstein's decision in Rahain, the defendant in that case violated the terms of his bail and was ordered detained by Judge Bloom.  See United States v. Raihan, No. 20-CR-68 (BMC), ECF Dkt. Nos. 21-22.

at that hearing that aside from the arrest from which the alleged violation of supervised release arises, the Defendant does not have a violent background:  no prior convictions involved violent conduct or gun charges."  Id. at *2.  Those facts bear no relation to the facts here, where the defendant's criminal history and the facts of this case amply demonstrate the defendant's dangerousness and risk of flight.

As for the risks to the defendant from the COVID-19 pandemic, the Stephens court specifically declined to rule on whether the health risks from the pandemic presented a "compelling reason necessitating [the defendant's] release."  Id. at *3 n.3.  Rather, the court found release appropriate under § 3142(i) because the defendant had proffered specific, unrebutted facts demonstrating that the precautions taken by the BOP were impeding his ability to prepare for a hearing scheduled for less than one week away.  Id. at *3.  Here, by contrast, the defendant has no scheduled trial date, and he has proffered no facts demonstrating an inability to prepare his defense.[5]

The defendant overlooks more applicable cases addressing this issue from within this district and around the country.  For example, the Honorable Margo K. Brodie (sitting as the duty district judge) denied an application seeking release on the basis of COVID-19 in United States v. Hamilton, No. 19-CR-54 (NGG).  See Ex. B.  As the court explained, because the defendant had "been deemed to be both a danger to society and a risk of flight," he could not be released absent a showing of "changed circumstances that would warrant [the court] balancing [those] factors differently."  Id. at 7.  The court found no such changed circumstances from the risk of COVID-19, particularly given that there was no evidence that the defendant was "any more at risk than most of the inmates who are similarly situated."  Id. at 9.  Following Judge Brodie's decision, the defendant in Hamilton renewed his application to the assigned district judge, the Honorable Nicholas G. Garaufis.  Judge Garaufis denied bail as well.  See United States v. Hamilton, No. 19-CR-54 (NGG), 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020).[6]

The Honorable LeShann DeArcy Hall also denied a motion for bail on the basis of COVID-19 in United States v. Campbell, 18-CR-467 (LDH), Minute Entry & Order, dated March 26, 2020.  Judge DeArcy Hall held that the risk of COVID-19 infection was not an extraordinary circumstance warranting bail because the defendant — like the defendant here — "does not suffer from any medical conditions that make him particularly susceptible

---

[5]  United States v. Hudson, No. 19-CR-496 (CM) (S.D.N.Y) (cited at Def. 2d Mot. 5), also involved a defendant who had an impending trial and who established that he was unable to adequately prepare for trial.  See id., ECF Dkt. No. 70 ("A complete cessation of visits [because of COVID-19] at this critical time of preparation would make it impossible to adequately prepare for trial.").  In addition, Hudson was a pre-trial defendant who was not subject to the mandatory detention requirements of § 3143 and Fed. R. Crim. P. 32.1.

[6]  Judge Garaufis also denied an application for bail on the basis of COVID-19 in United States v. Lipsky, No. 19-CR-203 (NGG), on March 24, 2020.

to contracting the virus and, at 53 [five years older than the defendant here], his age is also not particularly concerning." Id.

Outside of this district, the recent decision in United States v. Avenatti, No. 19-CR-61 (C.D. Cal. Mar. 21, 2020), ECF No. 121, is also illustrative. In that case, the court denied the bail application of defendant Michael Avenatti, who was detained at the Metropolitan Correctional Center in Manhattan. See Ex. C. This decision is notable for several reasons. First, the court distinguished Stephens, noting that, unlike the defendant in Stephens, Avenatti had not presented any evidence to "undermine" the court's determination that Avenatti — charged with non-violent, economic crimes — posed a danger to the community. See Ex. C at 2. Second, the court denied bail even though Avenatti argued that he was at greater risk from COVID-19 because he had contracted pneumonia only six months earlier. See id. The court found significant the absence of any evidence showing that Avenatti's "cell mate was infected by the virus." See id. Third, the court held that release pursuant to 18 U.S.C. § 3142(i) was unavailable because the defendant sought "full bail" rather than "temporary release." Id. Finally, the court determined that release under § 3142(i) was further inappropriate because, "[n]otwithstanding any current limitations on attorney visits, there will be an adequate opportunity to prepare [for trial] once conditions normalize." Id. at 2-3.

The reasoning in Avenatti applies equally to the facts of this case. First, as in Avenatti, the instant motion offers no basis to undermine the clear conclusion that the defendant presents a danger to the community and a risk of flight. Second, although an inmate at the MDC has tested positive for COVID-19, the government is unaware of any information suggesting that the defendant has been exposed to that inmate. Third, although § 3142(i) provides only for temporary release, the defendant has sought full bail. Finally, as noted above, no trial date has been scheduled. Thus, as in Avenatti, the defendant has presented no evidence that he cannot adequately prepare for trial unless he is released from custody.

Based on these cases, as well as the facts set forth above, the government submits that COVID-19 does not constitute a basis for the defendant's release, particularly in light of the high standard he must overcome and the facts demonstrating his dangerousness and risk of flight.

IV.    Conclusion

For the reasons set forth above, the government respectfully submits that the defendant cannot demonstrate by clear and convincing evidence that he is not likely to flee or

pose a danger to the safety of any other person or the community if released.  The defendant should remain detained.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/
Jonathan Siegel
Michael W. Gibaldi
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (by ECF)
     Richard Ware Levitt, Esq. (by ECF)

14