

U.S. Department of Justice

United States Attorney
Eastern District of New York

JRS/MWG
F. #2019R00447

271 Cadman Plaza East
Brooklyn, New York 11201

January 5, 2023

By ECF

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:    United States v. John Martin
                  Criminal Docket Nos. 03-795 (RJD) and 19-221 (S-3) (RJD)

Dear Judge Dearie:

        The government respectfully submits this letter in advance of the sentencing of the defendant John Martin, which is currently scheduled for January 12, 2023, at 11:00 a.m.  On July 30, 2021, the defendant pleaded guilty to a Superseding Indictment charging one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a) (Count One), one count of using or threatening force in furtherance of a plan to commit robbery, in violation of 18 U.S.C. § 1951(a) (Count Two), and one count of brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Three).  At the same proceeding, the defendant pleaded guilty to Charges One, Two and Three of his Violation of Supervised Release ("VOSR") Report.  Since that time, the government has moved to dismiss Count Three of the Superseding Indictment (see No. 19-CR-221, ECF Dkt. No. 348) and the defendant has moved to dismiss Charge Two of the VOSR Report, which the government does not oppose (see No. 03-CR-795, ECF Dkt. No. 705).

        As the Court knows from presiding over the recent trial of co-defendant Lamonte Johnson, the defendant was one of a group of robbers who committed or attempted to commit a series of robberies primarily targeting Chinese-Americans in 2019.  In particular, on one occasion, the defendant participated in a home invasion robbery where two of his co-conspirators sexually assaulted a woman.  For the reasons discussed below, the government submits that a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 256 to 320 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing set forth at 18 U.S.C. § 3553(a).

I.   Background

   A.   The Offense Conduct

      1.   The Robbery Conspiracy

   From approximately April to May 2019, the defendant participated in a conspiracy with Lamonte Johnson, Shi Zhen Lin, Corey Mobley, Brandon Daniels and Ivan Eli to commit armed robberies in New York and New Jersey with the goal of stealing narcotics and commercial proceeds. Johnson and Lin knew each other because they were previously incarcerated together at the Sing Sing Correctional Facility. Johnson, who was incarcerated at Auburn Correctional Facility during the entire period of the conspiracy, is the defendant's brother. Johnson introduced Lin and the defendant for the purpose of committing robberies, with the expectation that Johnson would get a share of any money that the robbery crew stole. Lin, in turn, identified Chinese-American victims for the defendant and others to rob. See Presentence Investigation Report ("PSR") ¶¶ 8-10.

      2.   The New Brunswick Attempted Robbery and Robbery

   In furtherance of the conspiracy, the defendant, Mobley, and Eli traveled to New Brunswick, New Jersey, on March 29, 2019, to commit a robbery based on information provided by Lin. The robbers believed that their intended victims were going to be carrying a large amount of cash. Mobley, who was armed with a gun, planned to ambush the intended victims outside their apartment. Eli disagreed with the plan as too risky and later noticed security cameras in the complex, so the robbers decided to abandon their plan and left the area. See PSR ¶ 11.

   The following week, on April 6, 2019, cell site evidence shows that the defendant and Mobley (without Eli) traveled back to the same area in New Brunswick, New Jersey. Consistent with Lin's role in the conspiracy as the source of information for the defendant, phone records show an unusual volume of calls between Lin and the defendant on that day. Later that evening, Johnson spoke with the defendant on a telephone call that was recorded by the state prison at which Johnson was incarcerated. After stating that he was coming back from New Jersey with Mobley, the defendant bragged to Johnson about how much money he and Mobley had just stolen. The defendant and Johnson also discussed that the robbery was based on information from "Kev" (Lin's anglicized nickname is Kevin), and that they hoped to obtain other jobs from "Kev" in the future. See PSR ¶ 12.

   On April 7, 2019, the defendant had numerous phone calls with Johnson and Lin to discuss dividing the proceeds of the robbery — $120,000 of cash and $50,000 worth of an unnamed item. Based on the calls and cell site data, the defendant met Lin in Queens that day to give Lin his share of the proceeds. See PSR ¶ 13.

      3.   The Staten Island Attempted Robbery

   In furtherance of the conspiracy, the defendant, Daniels, Mobley, and Eli traveled to Staten Island, on May 3, 2019, to commit a home-invasion robbery in Staten Island. The robbers believed that their intended victims were going to have large amounts of cash and

jewelry. Daniels and Mobley were both armed with firearms and had a robbery kit of masks, gloves and zip ties. The robbers traveled to a wooded area outside the victims' home where they waited for one of the targets to take the trash out. But when two women finally came out of the house, the robbers realized they were too far away to successfully push their way inside without scaring off the women. They therefore decided to call off the robbery at the last second. See PSR ¶ 14.

    4.  The Queens Home Invasion Robbery

   As part of the same conspiracy, the defendant, Mobley, and Daniels participated in an armed home invasion robbery in Little Neck, Queens, on May 4, 2019. (Mobley asked Eli to attend, but Eli declined.) Much of the robbery was caught on audio-video surveillance from cameras located inside and outside the home, which were admitted in evidence and published to the jury at Lamonte Johnson's trial. The occupants of the home were five adults, including an elderly disabled woman, and three young children. See PSR ¶ 15.

   On May 4, 2019, at approximately 9:30 p.m., Daniels and Mobley forced their way into the victims' home, with Daniels brandishing a firearm. Once inside the home, Daniels and Mobley forced the screaming occupants into a downstairs bedroom. Because the elderly woman in the home could not walk, Mobley dragged her and the young child she was holding across the floor into the room. Daniels and Mobley immediately asked their victims where the camera system in the home was located. Then they told the victims that they knew there was money in the house, and they were not leaving without the money. Daniels and Mobley searched and ransacked the upstairs bedrooms, including by searching inside the air conditioning vents in the ceiling. Mobley threatened to kill all of the occupants if they did not tell the robbers where the money was. Consistent with Eli's testimony that the robbers expected to find tens of thousands of dollars in narcotics proceeds, Daniels and Mobley continued to demand money even after one of the occupants ("Victim 1") gave them a few thousand dollars that had been set aside as a gift for the family. See PSR ¶ 16.

   During the robbery, Daniels pulled Victim 1 out of the downstairs bedroom, brought her upstairs, and demanded to know where the money was. Victim 1, who testified at Lamonte Johnson's trial, told Daniels that she did not know where any money was located because the house belonged to her brother, who was not home. Daniels threatened to "do things" to her if she did not give him the money. When she continued to insist that she did not know about any money, Daniels pulled down his pants and Victim 1's pants, and then Daniels rubbed his penis against Victim 1's anus while holding a gun to her back. See PSR ¶ 17.

   At approximately 9:40 p.m., Mobley called the defendant, told him that he and Daniels were inside, and asked the defendant to come inside. The defendant, who had been on the phone with Johnson at the time, ended his call with Johnson, and video surveillance from inside the house shows that the defendant entered the house. The surveillance video shows that the defendant was in the home for several minutes, spoke to Daniels and Mobley, and then went back outside to a four-door sedan. According to cell site data, the defendant remained in the area for the next fifteen minutes and continued calling his co-conspirators inside the home, with one call to Daniels and over a dozen calls to Mobley. Phone records also show that, while the

3

robbery was taking place, the defendant exchanged numerous phone calls with Lin. See PSR ¶¶ 20-21.

After the defendant went back outside, Mobley and Daniels continued to demand money. When Victim 1 remained unable to provide money, Mobley pulled her into her mother's bedroom, where he also sexually assaulted her. He then took her back to the room where her children were being held and threatened to kill Victim 1's children or her mother, stating, "Who's it going to be, your mother or your children?" When Victim 1 still could not produce money, Mobley stated, "All right, shoot the kids," causing Victim 1 to break down hysterically crying. See PSR ¶ 19.

Mobley insisted she was "playing games." He then pulled Victim 1 into her mother's bedroom, where he sexually assaulted her for the third time that night, forcing her to perform oral sex on him until he ejaculated in her mouth. Video surveillance then shows Mobley take Victim 1 to the bathroom, where he told her to rinse out her mouth. See PSR ¶ 22.

Daniels and Mobley fled the scene in an SUV at approximately 10:10 p.m. — the same time that Martin's cell site records show that he left the area in his separate car. Later that night, all three men reunited at Daniels's apartment in Brooklyn, where Lin and the defendant called each other several additional times. See PSR ¶ 22.

Cell site data for the defendant, Daniels, and Mobley place all three at the location of the robbery. In addition, Daniels's DNA was identified on fragments of blue latex gloves found at the scene and on Victim 1's clothes, and Mobley's DNA was identified on stains on Victim 1's clothes and from a sperm found inside her mouth. Victim 1 later identified Mobley from a photo array as one of the robbers. See PSR ¶ 23.

### 5. The Suffolk County Attempted Robbery

Finally, Daniels, Eli, and Mobley attempted to rob a family in Suffolk County, New York on May 5, 2019, based on information that Lin gave to the defendant. Specifically, Lin gave the defendant information about a Chinese family living in Setauket, Long Island that was believed to have $1 million of cash hidden in the walls of their home. Cell site evidence shows that the defendant cased the residence on March 14, 2019, and when the defendant was at the location, he spoke by phone with Lin. Daniels, Eli, and Mobley went back to Setauket to commit the home invasion robbery on the evening of May 5, 2019 — the day after the Queens home invasion. The robbers broke into the garage and were planning to enter the home armed with guns. However, as Eli testified at Johnson's trial, Eli thought Mobley's plan to rush into the home was too risky, so Eli tricked Mobley into believing that the home had an alarm system. The robbers then left the garage without entering the house. After they left, the robbers contacted the defendant, who was upset that the men had attempted the robbery without notifying him. See PSR ¶ 25.

### B. The Defendant's Criminal History

This robbery conspiracy was only the most recent in the defendant's long string of violent crimes, including prior robberies, an attempted murder, multiple shootings and a kidnapping.

4

The defendant's first arrest was for an armed robbery in 1988, when he was 16 years old. He was arrested for a second robbery two months later and ultimately pleaded guilty to them both and sentenced to terms of one to three years' imprisonment for each offense. See PSR ¶¶ 93-94. While in prison for those offenses, the defendant was arrested for assaulting a prison guard. He resolved that arrest by pleading guilty to making and introducing dangerous contraband into the prison. See PSR ¶ 95. He was released on parole in November 1995.

The defendant promptly returned to criminal activity through participation in the "Martin Family Crew" — a violent drug trafficking organization led by the defendant and his siblings. See PSR ¶ 97. The defendant's role in the organization was to act as the "enforcer" and to manage the organization's drug distribution operations in Connecticut. See id. In 1996 — just a few months into his parole — the defendant shot a rival drug dealer in the stomach in the middle of a video store. See PSR ¶¶ 96-97. He was arrested and convicted for this shooting and served approximately five years in prison. See PSR ¶ 96. Shortly after his release, in 2001, the defendant shot at two additional members of a rival drug dealing crew, but all witnesses to the crimes (including the victims) were too afraid of the defendant and his family to speak to the police or to press charges. See 2006 Pre-Sentence Investigation Report (the "2006 PSR") ¶¶ 30-31. In 2003, the defendant, his brother Jerrod and another member of the Martin Family Crew kidnapped one of the organization's couriers at gunpoint when she failed to make a delivery. See 2006 PSR ¶¶ 33-37. The defendant and his brother repeatedly slapped the victim and took her to the defendant's apartment, where she was beaten by his brother and forced to insert drugs into her vagina for a subsequent delivery.

The defendant was indicted on federal charges for his role in the Martin Family Crew in 2003. From the fall of 2004 until his arrest in May 2005, the defendant was a fugitive. See 2006 PSR ¶ 41. On July 5, 2006, the defendant pleaded guilty to one count of distributing cocaine and cocaine base and was originally sentenced to 235 months' imprisonment and twelve years of supervised release. See PSR ¶ 97. Following amendments to the United States Sentencing Guidelines, the defendant's sentence was reduced to 188 months in 2008, 168 months in 2012 and then 140 months in 2015. He was released from prison in November 2015 and commenced his term of supervised release. See id.

    C.    Victim Impact

Victim 1 of the Queens robbery, who testified at Lamonte Johnson's trial, has submitted a statement describing the traumatic impact of the armed home invasion on the lives of herself and her family. She describes how that night "haunts" her to this day with memories of Daniels and Mobley "threatening to kill my young son, gun pointed to his head," and being sexually assaulted by both men "while my mom and children could only hear me whimpering, and not know why." These horrific experiences have left Victim 1 feeling unsafe in her own home, and anxious and embarrassed by the publicity that this home invasion received by the media. She has "endured sleepless, tear-filled nights over the last three years" that she has struggled to keep from her young children, because she wants to "be strong for them" while they cope with the trauma themselves. Her young children felt "scared to continue with their lives after the incident" — "insist[ing] on going home whenever it got dark outside," "shut[ting] off the television whenever they see any robbery scenes," and expecting that "people intend to harm them." PSR Add.

II.      The Sentencing Guidelines

The government agrees with the Probation Department's calculation of the Guidelines Offense Level, which is as follows, except that the government does not intend to make a motion for timely acceptance of responsibility:[1]

Count One: New Brunswick Attempted Robbery on March 29, 2019

| | |
|---|---:|
| Base Offense Level (§ 2B3.1(a)) | 20 |
| Plus: A firearm was possessed (§ 2B3.1(b)(2)(B)) | +5 |
| Plus: Obstruction of justice (§ 3C1.1) | +2 |
| Total: | 27 |

Count One: New Brunswick Robbery on April 6, 2019

| | |
|---|---:|
| Base Offense Level (§ 2B3.1(a)) | 20 |
| Plus: Loss of more than $95,000 (§ 2B3.1(b)(7)(C)) | +2 |
| Plus: Obstruction of justice (§ 3C1.1) | +2 |
| Total: | 24 |

Count One: Staten Island Attempted Robbery on May 3, 2019

| | |
|---|---:|
| Base Offense Level (§ 2B3.1(a)) | 20 |
| Plus: A firearm was possessed (§ 2B3.1(b)(2)(B)) | +5 |
| Plus: Obstruction of justice (§ 3C1.1) | +2 |
| Total: | 27 |

Count One and Count Two: Queens Robbery on May 4, 2019

| | |
|---|---:|
| Base Offense Level (§ 2B3.1(a)) | 20 |
| Plus: A firearm was possessed (§ 2B3.1(b)(2)(B)) | +5 |

---

[1] The defendant pleaded guilty less than two months before the then-anticipated trial date, after the government had begun preparations for trial. The government was clear at the time of the defendant's plea that it did not intend to move to give the defendant a third point for timely acceptance of responsibility under U.S.S.G. § 3E1.1(b). See ECF Dkt. No. 148.

|   |   |   |
|---|---|---|
| Plus: | A victim sustained serious bodily injury (§ 2B3.1(b)(3)(B)) | +4 |
| Plus: | A person was restrained to facilitate commission of the offense (§§ 2B3.1(b)(4)(B) & 3A1.3) | +2 |
| Plus: | Vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Plus: | Obstruction of justice (§ 3C1.1) | <u>+2</u> |
| Total: | | <u>35</u> |

Count One: Suffolk County Attempted Robbery on May 5, 2019

|   |   |   |
|---|---|---|
| Base Offense Level (§ 2B3.1(a)) | | 20 |
| Plus: | A firearm was possessed (§ 2B3.1(b)(2)(B)) | +5 |
| Plus: | Obstruction of justice (§ 3C1.1) | <u>+2</u> |
| Total: | | <u>27</u> |

Multiple Count Analysis

Highest Adjusted Offense Level: 35

|   |   | Level | Units |
|---|---|---|---|
| Group 1: | New Brunswick Attempted Robbery | 27 | 0.5 |
| Group 2: | New Brunswick Robbery | 24 | 0.0 |
| Group 3: | Staten Island Attempted Robbery | 27 | 0.5 |
| Group 4: | Queens Robbery | 35 | 1.0 |
| Group 5: | Suffolk County Attempted Robbery | 27 | <u>0.5</u> |
| Total Number of Units: | | | <u>2.5</u> |

|   |   |   |
|---|---|---|
| Plus: | 2.5 Units (§ 3D1.4) | +3 |
| Less: | Acceptance of responsibility (§ 3E1.1) | <u>-2</u> |
| Total Adjusted Offense Level: | | <u>36</u> |

PSR ¶¶ 47-91 (as amended). Based on the defendant's criminal history, the defendant is in Criminal History Category III. PSR ¶ 100. Accordingly, the applicable Guidelines range is 235 to 293 months' imprisonment.

As for the defendant's VOSR, the government agrees with the defendant that the remaining charges (assuming Charge Two is dismissed) are Grade B violations. See United States v. Chappelle, 41 F.4th 102 (2d Cir. 2022) (Hobbs Act robbery not crime of violence for purpose of Guidelines). Accordingly, pursuant to U.S.S.G. § 7B1.4, the Guidelines range for the defendant's violations of supervised release is 21 to 27 months' imprisonment.

Pursuant to U.S.S.G. § 7B1.3(f) and application note 4, the sentence imposed on the VOSR "shall" run consecutively to any sentence imposed on the Superseding Indictment. Accordingly, the combined effective Guidelines range is 256 to 320 months' imprisonment.

The defendant makes a number of arguments against the Guidelines calculations above, none of which have merit:

A. Objections to Robberies Other than the Queens Robbery

The defendant argues that he should not be held accountable for any of the conduct of the conspiracy other than the Queens robbery. See ECF Dkt. No. 375 ("Def. Mem.") at 4-6. That effort to avoid responsibility should be rejected.

The defendant pleaded guilty to Count One of the Superseding Indictment, which charged a conspiracy to commit Hobbs Act robberies. Pursuant to U.S.S.G. § 1B1.2(d), "a conviction on a count charging conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." In making the factual determination of what crimes the defendant conspired to commit, the Court may consider the testimony from the trial of Lamonte Johnson, with which this Court is well familiar. See United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989) (court properly relied on cooperator's trial testimony at sentencing for defendant who had not been part of trial; "It is not a denial of due process for the trial judge, when determining sentence, to rely on evidence given by witnesses whom the defendant could neither confront nor cross-examine."); see also United States v. Garcia, 167 F. App'x 259, 260-61 (2d Cir. 2006) (rejecting argument that "the district court improperly considered at sentencing the hearsay testimony of a cooperating witness who testified at the trial of Garcia's co-defendants, in violation of the Confrontation Clause of the Sixth Amendment"); United States v. Agyeman, 63 F. App'x 544, 546 (2d Cir. 2003) ("Judge Chin properly relied on his own knowledge of the extensive record in the trial of Agyeman's co-defendants, at which he presided."); United States v. Sisti, 91 F.3d 305, 312 (2d Cir. 1996) ("[I]nformation from other proceedings may be relied upon at sentencing so long as the defendant has an opportunity to respond in order that the court not rely on misinformation.").

The government respectfully submits that the testimony at the Johnson trial amply proves that the defendant was the central hub for all of the attempted robberies and robberies that occurred throughout the course of the conspiracy. See, e.g., Trial Tr. 180-84 (testimony by Ivan Eli describing structure of conspiracy); id. at 207-11 (discussing the defendant's role in New Brunswick attempted robbery); id. at 213-14, 220-21 (testimony regarding statements by Mobley that the defendant had been providing information for robberies of Chinese individuals); id. at 221-26 (testimony regarding Staten Island attempted robbery and the defendant's role); id. at 228-31 (discussing the defendant's role in providing information for Setauket robbery); see also

8

GX601 (recorded call between the defendant and Johnson discussing April 6, 2019 New Brunswick robbery).

Indeed, the defendant makes no argument against consideration of this conduct except to say that his "allocution referred only to the" Queens robbery. See Def. Mem. 5. But in light of the evidence that each of those robberies was a part of the conspiracy he helped organize — and that he directly participated in the planning or execution of all of them — the defendant's refusal to allocute to these robberies does not reduce his responsibility for them. This objection should therefore be overruled.

B.  Objection to the Serious-Bodily-Injury Enhancement

The defendant asserts that he should not be held responsible for the serious bodily injury to Victim 1 because he "did not want, intend or foresee that a sexual assault would occur." Def. Mem. 6. This argument rests on a misunderstanding of the relevant standard.

Under U.S.S.G. § 1B1.3(a)(1)(B), a member of jointly undertaken criminal activity is accountable for acts of others that were (i) "within the scope of the jointly undertaken criminal activity," (ii) "in furtherance of that criminal activity," and (iii) "reasonably foreseeable in connection with that criminal activity." The defendant does not contest that the first two requirements are met. Not could he. Mobley and Daniels used sexual violence and threats of sexual violence against Victim 1 to attempt to force her to give up the money that they believed she was hiding.

The only question remaining is whether it is "reasonably foreseeable" that a victim would suffer serious bodily injury during an armed robbery. The answer is yes, as the Second Circuit and other courts of appeal have repeatedly found. See United States v. Davis, 48 F. App'x 8, 9 (2d Cir. 2002) (serious injury reasonably foreseeable in "violent attack on a public facility"); United States v. Molina, 106 F.3d 1118, 1125 (2d Cir. 1997) (serious injury reasonably foreseeable in bank robbery where security guard inadvertently shot bystander); see also United States v. Snouffer, 14 F. App'x 905, 907 (9th Cir. 2001) (rejecting argument that defendant could not foresee victim would jump out a window; "Bodily injury to a victim during a bank robbery is a foreseeable consequence of the robbery"); United States v. Metzger, 233 F.3d 1226, 1227-28 (10th Cir. 2000) (rejecting argument that defendant who committed unarmed robbery with a note could not foresee that police would shoot bystander during search for perpetrator; "Instead of asking whether Metzger could have expected events to unfold in precisely the way they did, we ask more broadly whether it was foreseeable that, given the inherently dangerous nature of bank robbery, a bystander might be seriously injured during the flight or apprehension of a perpetrator. It is plain that the violent nature of the offense of bank robbery carries with it the inherent prospect that someone could be injured in the robbery or its aftermath.").

It is also doubtful, given the defendant's relationship with Mobley, that he did not in fact foresee the risk that Mobley would commit serious violence. Ivan Eli, who knew Mobley less well than the defendant, was so concerned about Mobley's evident recklessness and violence that he was unwilling to go forward with a home-invasion robbery with him, even with the promise of a million dollars. See Trial Tr. 233, 236. The defendant knew exactly who Corey

9

Mobley was and chose to use Mobley to commit armed robberies for him. That decision had profound consequences, and the defendant ought not be permitted to escape responsibility for that choice.

This objection therefore fails.

C.   Objection to the Vulnerable Victim Enhancement

The defendant objects to the vulnerable victim enhancement because he denies that he "knew or should have known" that the victims included elderly individuals and children. Def. Mem. 7-8. This argument lacks merit for two reasons. First, because the defendant himself entered the home during the robbery, he saw the young and elderly victims cowering in the bedroom that he can be seen walking past on surveillance video. He therefore did, in fact, know that the crime involved vulnerable victims. Second, "should have known" is a negligence standard. See United States v. Cruz, 106 F.3d 1134, 1139 (3d Cir. 1997) (purpose of vulnerable victim enhancement "is simply to acknowledge that . . . in many instances defendants know or should know of their victim's particular vulnerability and are therefore more blameworthy for knowingly or even negligently harming them"). To determine what the defendant "should have known" requires the Court to decide what duty the defendant had to learn of his victims' vulnerability before he acted. See Tappen v. Ager, 599 F.2d 376, 379 (10th Cir. 1979) ("negligence does not exist in the abstract, it contemplates a legal duty owing from one party to another and the violation of that duty by the person owing it"). Although the government has not found caselaw in either direction on this issue, the government respectfully submits that a person who plans a home-invasion robbery has a duty to know if the home is full of children and elderly victims and should be responsible for the consequences of his actions if he does not take the time to know who he might be hurting.

The Court should therefore reject this objection.

D.   Objection to the Obstruction of Justice Enhancement

In April 2022, the defendant provided a sworn affidavit in connection with defendant Lamonte Johnson's pre-trial motion practice. See ECF Dkt. No. 244 at 3. In that affidavit, the defendant falsely claimed that he had never conspired with Johnson to commit any of the crimes in the Superseding Indictment. As the jury found in Johnson's trial, that claim was false.

The defendant argues that this false affidavit does not warrant an obstruction enhancement because he did not testify falsely at a hearing or trial and did not submit a false affidavit in support of a motion to suppress. Def. Mot. 8. He further claims that "the affidavit does no more than provide Mr. Martin's lay opinion about the charges against Mr. Johnson" and notes that "the government was not hindered, in any way, by the affidavit." Id. at 9. He further argues that the defendant lacked a specific intent to obstruct justice. Id. These arguments lack merit.

First, it is irrelevant that the defendant did not testify at trial or a hearing or that the affidavit was not in connection with a motion to suppress. An obstruction enhancement is appropriate, among other bases, when a defendant "provid[es] materially false information to a

judge." U.S.S.G. § 3C1.1 application note 4(F); see also United States v. Shahid, 390 F. App'x 24, 26 (2d Cir. 2010) ("The adjustment is applicable when a defendant gives 'materially false information to a judge.'" (quoting U.S.S.G. § 3C1.1 application note 4(F))). That is precisely what the defendant did.

Second, it is irrelevant that the defendant's efforts to obstruct justice failed. Under the circumstances here, the enhancement applies equally to attempted and successful obstruction. See U.S.S.G. § 3C1.1 (enhancement applies to defendants who "attempt[] to obstruct or impede[] the administration of justice"); compare U.S.S.G. § 3C1.1 application note 4(F) (no requirement of successful obstruction for false statements to courts), with id. application note 4(G) (requiring successful obstruction for false statements to law enforcement).

Third, the defendant's attempt to characterize his false statements as "lay opinion" does not hold water. The defendant understands what a conspiracy is, having been charged and having pleaded guilty in two separate federal conspiracy cases over his lifetime. The defendant in his affidavit also made a number of specific factual claims that are untrue, such as his statement that he and Johnson never spoke "about how to make such criminal venture(s) successful" (ECF Dkt. No. 244 at 3), a claim that is directly contradicted by his own recorded calls with Johnson where Johnson gave the defendant advice about how to manage his relationship with Lin. The defendant knew those claims were factually false.

Fourth, the defendant's self-serving claim that he did not intend to obstruct justice is not credible. The defendant submitted a sworn and notarized affidavit where he claimed that he was prepared to testify at a hearing or trial. There is no plausible interpretation for what the defendant intended to accomplish other than to influence a judicial proceeding with his false claims. That is definitionally obstruction.

Finally, although the defendant does not challenge the materiality of his false statements, the false statements were material both in Johnson's case and in his own. The affidavit was submitted as part of Johnson's efforts to have the Superseding Indictment dismissed and his efforts to show that his attorneys had not properly interviewed witnesses. As for the defendant's own case, claims that the defendant did not conspire with Johnson are a part of the defendant's overall effort to deny the full scope of the conspiracy and avoid responsibility for all of the robberies committed as part of that conspiracy.

As with the above objections, the defendant is attempting to escape responsibilities for his actions. The simple fact, however, is that the defendant knowingly and willfully submitted a false affidavit to this Court. He should be held accountable for that conduct.

III. A Guidelines Sentence Is Warranted

The government respectfully requests that the Court impose a sentence within the Guidelines range of 256 to 320 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the defendant's offense, the need for deterrence, and to achieve the other purposes of sentencing.

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed to be reasonable because "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 358 (2007). "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." Id. at 350. Furthermore, Guidelines sentences promote Congress' goal in enacting the Sentencing Reform Act: "to diminish unwarranted sentencing disparity." Id. at 354.

A Guidelines sentence in this case would reflect the serious nature of the offense and promote respect for the law. See 18 U.S.C. §§ 3553(a)(1), 3553(a)(2)(A). There can be no question that armed robbery is an extremely serious crime under any circumstance. See Graham v. Florida, 560 U.S. 48, 69 (2010) (observing that robbery is "a serious crime deserving serious punishment"); United States v. Mendola, 807 F. Supp. 1063, 1065 (S.D.N.Y. 1992) (noting that armed robbery "is one of the more serious federal crimes."). The offense conduct here was particularly appalling. Daniels and Mobley physically and emotionally brutalized the family in Little Neck, Queens. Nothing can excuse or explain this depraved conduct or the defendant's role in supplying victims for such violent individuals.

Moreover, the need for deterrence, both general and specific, supports a sentence within the Guidelines. See 18 U.S.C. § 3553(a)(2)(B). With respect to specific deterrence, the defendant participated in this robbery conspiracy after what can only be described as a lifetime of crime. None of the defendant's numerous prior convictions successfully deterred the defendant. Supervised release and parole have not successfully deterred the defendant. Even when the defendant was given a second chance at life when his 235 month sentence was reduced to 140 months, he took that only as an opportunity to commit further violent crimes. Accordingly, a lengthy sentence of imprisonment is necessary to send a message to this defendant that his repeated criminal conduct will be justly punished. In addition, a Guidelines sentence is necessary to send a clear message to the community — and in particular to individuals on supervised release — that recurrent violent behavior, including armed robberies, will result in a substantial prison sentence.

Relatedly, a Guidelines sentence would also account for the history and characteristics of the defendant. See 18 U.S.C. § 3553(a)(1). While the government acknowledges the serious social ills discussed in the defendant's sentencing submission, they do not excuse his extreme behavior or mitigate the harm he has done and is likely to continue to do upon release. Further, while the defendant highlights his ties to friends and family, those ties existed at the time of the offense conduct, too. There is no reason to believe that the defendant's family and community ties will be more effective at preventing future crimes by the defendant than they were at preventing his prior violent conduct. If anything, the defendant's family ties appear to have been a recurrent pull to criminal conduct throughout the defendant's life, as his time in the Martin Family Crew and the facts of this case show. The defendant therefore appears

likely to recidivate, and a substantial sentence is necessary to protect the community from future acts of violence by him.

A sentence within the Guidelines is also appropriate to avoid unwarranted sentencing disparities with others convicted of similar conduct. See 18 U.S.C. § 3553(a)(6). As the Court is aware, Mobley was sentenced to a Guidelines sentence of 228 months. Although Mobley's conduct was more heinous than the defendant's, the defendant's slightly higher Guidelines appropriately reflect the defendant's higher role in the conspiracy, his attempted obstruction of justice, and his commission of the offense while on supervised release. The defendant's higher Guidelines also appropriately reflect the defendant's lesser acceptance of responsibility. Unlike Mobley, the defendant pleaded guilty only shortly before trial and continues to deny responsibility for the full scope of his conduct, as detailed above.

The conditions at the MDC Brooklyn during the ongoing COVID-19 pandemic do not warrant a sentence below the Guidelines range. Although "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001), in evaluating the reasonableness of a sentence imposed at the low end of the applicable Guidelines range, the Second Circuit recently held that there is "no authority suggesting that a district court imposing a sentence is obligated to assign even this much weight [i.e., a sentence as the low end of the applicable Guidelines range], let alone more, to the harsh prison conditions brought on by the pandemic," United States v. Edwards, No. 21-1248, 2022 WL 1553455, at *2 (2d Cir. May 17, 2022). Here, a downward departure or variance is unwarranted due to the particularly heinous nature of the crime and the defendant's extensive criminal history.

IV.     Conclusion

For the foregoing reasons, the government respectfully submits that a sentence within the Guidelines range of 256 to 320 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/_____
        Jonathan Siegel
        Michael W. Gibaldi
        Assistant U.S. Attorneys
        (718) 254-6293/6067

cc:     Clerk of the Court (RJD) (by ECF)
        Counsel of Record (by E-Mail and ECF)
        Senior United States Probation Officer Roberta Houlton (by E-Mail)